## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JULIE GOLLA, | ) | |
| | ) | |
|     Plaintiff/Counterclaim | ) | |
|     Defendant, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04:20-cv-00071 |
| | ) | |
| | ) | |
| NOVO NORDISK INC., | ) | |
| | ) | |
|     Defendant/Counterclaim | ) | |
|     Plaintiff/Third-Party Plaintiff, | ) | |
| | ) | |
| BIOMARIN PHARMACEUTICAL | ) | |
| INC., | ) | |
| | ) | |
|     Third-Party Defendant. | ) | |


## PLAINTIFF/COUNTERCLAIM DEFENDANT JULIE GOLLA AND
## THIRD-PARTY DEFENDANT BIOMARIN PHARMACEUTICAL INC.'S
## OPPOSITION TO DEFENDANT NOVO NORDISK INC.'S MOTION FOR
## TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

I.     SUMMARY ....................................................................................1

II.    NOVO HAS NOT MET ITS BURDEN FOR INJUNCTIVE RELIEF ........3

       A.     Novo Has Not Demonstrated A Substantial Likelihood That It
              Will Prevail On Its Claim That Golla Breached the Non-
              Compete ..............................................................................4

              1.     Texas Law Applies to Enforcement of the Non-Compete.........4

              2.     BioMarin is Not a Competitor of Novo ....................................6

              3.     Novo's Legitimate Business Interest is Narrower than the
                     Non-Compete ........................................................................12

       B.     Novo Has Not Shown There Is a Substantial Threat of
              Irreparable Injury If Golla Is Not Enjoined.......................................15

       C.     The Balance of Harms Favors Golla .................................................19

       D.     Granting Injunctive Relief Will Disserve the Public Interest ............20

       E.     Novo's Other Claims Do Not Merit Injunctive Relief.......................21

III.   CONCLUSION ............................................................................. 23

# TABLE OF AUTHORITIES

**Page**

<small>**CASES**</small>

*ADP, LLC v. Capote*,
No. A-15-CA-714-SS, 2016 WL 3742319 (W.D. Tex. July 7, 2016) ................................................................................................6

*Brink's Inc. v. Patrick*,
No. 3:14-CV-775-B, 2014 WL 2931824 (N.D. Tex. June 27, 2014)................16

*DeSantis v. Wackenhut Corp.*,
793 S.W.2d 670 (Tex. 1990) ..............................................4, 5, 6, 12

*Elizabeth Grady Face First, Inc. v. Escavich*,
321 F. Supp. 2d 420 (D. Conn. 2004)................................................10

*Exxon Mobil Corp. v. Drennen*,
452 S.W.3d 319 (Tex. 2014) ..................................................4

*Holland Am. Ins. Co. v. Succession of Roy*,
777 F.2d 992 (5th Cir. 1985) ..................................................4

*Humana, Inc. v. Jacobson*,
804 F.2d 1390 (5th Cir. 1986) ................................................15

*Lake Charles Diesel, Inc. v. Gen. Motors Corp.*,
328 F.3d 192 (5th Cir. 2003) ..................................................3

*M-I, L.L.C. v. Stelly*,
No. H-09-CV-01552, 2009 WL 2355498 (S.D. Tex. July 30, 2009)................18

*Mayo v. Hartford Life Ins. Co.*,
354 F.3d 400 (5th Cir. 2004) ..................................................4

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*,
760 F.2d 618 (5th Cir. 1985) ..................................................4

*Ponce v. Socorro Indep. Sch. Dist.*,
   508 F.3d 765 (5th Cir. 2007) ........................................................3, 19

*S.M. Wilson & Co. v. Urban Concrete Contractors*,
   No. 04-06-00227-CV, 2007 WL 1423881 (Tex. App. May 16,
   2007) ..............................................................................................21

*Staples, Inc. v. Sandler*,
   No. 3:07-CV-0928-K, 2008 WL 4107656 (N.D. Tex. Aug. 29,
   2008) ..........................................................................................12, 13

*Tom James Co. v. Mendrop*,
   819 S.W.2d 251 (Tex. App. - Fort Worth 1991, no writ)...................18

*Travel Masters, Inc. v. Star Tours, Inc.*,
   827 S.W.2d 830 (Tex. 1991) ...........................................................22

*TRAVELHOST, Inc. v. Figg*,
   No. 3:11-CV-0455-D, 2011 WL 6009096 (N.D. Tex. Nov. 22,
   2011) ..............................................................................................16

*W.R. Grace & Co.-Conn. v. Henson*,
   No. 13-06-668-CV, 2007 WL 2389547............................................18

**STATUTES**

Tex. Bus. & Com. Code §§ 15.50(a) ......................................................12

**OTHER AUTHORITIES**

21 C.F.R. 202.1(e)(6)(ii) ........................................................................17

https://endpts.com/ip-trouble-defers-launch-of-novos-long-acting-
   hemophilia-therapy/ ..........................................................................8

# I. SUMMARY

There is no emergency requiring immediate court action. To the contrary, in its Motion for Temporary Restraining Order ("Motion"), Novo Nordisk ("Novo") asks this Court to enjoin Plaintiff Julie Golla ("Golla") (who worked at Novo for just over 13 months) from working for BioMarin Pharmaceutical, a company that does not currently sell or market a single product that competes with a single product that Novo sells or markets, in connection with its novel gene therapy treatment that the Food and Drug Administration ("FDA") has not yet approved. Until the FDA approves BioMarin's gene therapy, which will not be prior the third fiscal quarter of this year and may not happen at all, BioMarin (and thus Golla) will not sell or promote any products in the hemophilia disease state. As an initial matter, there is no non-compete in any of the agreements Novo submitted in this case that restricts Golla after the termination of her employment. (*See* Dkt. No. 7, Dkt. No. 10).[1]

Even if the parties' agreement contains the noncompetition clause quoted in the Motion (at 13) (the "Non-Compete"), Novo's Motion must still be denied. That noncompetition clause plainly does not prohibit Golla from performing services for a company that is not a competitor of Novo or for a company that is

---

[1] Novo's Motion states the agreement attached as Exhibit B to Keith Middleston's Declaration was provided to Golla at the outset of her employment. (Dkt. No. 10-2). That agreement does not contain a post-employment non-compete.

preparing to compete. As such, Novo cannot meet its burden of demonstrating a "substantial likelihood of success" on its breach of contract claim. Novo's Motion should be denied for this reason alone.

Moreover, any legitimate interests Novo may have in restricting Golla's activities are much narrower than the activities it seeks to restrain here. Contrary to what Novo claims (Mot. at 8), Golla acquired her knowledge of hemophilia and worked on hemophilia drugs *before she worked at Novo*. Also, Golla developed all of her customer relationships in southern half of Texas (where she will be working for BioMarin) *before she worked at Novo*. And Novo cannot point to any confidential information to which Golla had access to (she has not taken anything) at Novo that justifies keeping her out of BioMarin. BioMarin's gene therapy will be a fundamentally different treatment than what Novo sells; any of Novo's confidential information will be of no use to Golla at BioMarin.

Novo also cannot establish that it will be irreparably harmed if the Court does not enjoin Golla. In fact, Novo cannot demonstrate that it will suffer *any* harm because of Golla's employment at BioMarin. BioMarin's gene therapy, if approved, could be revolutionary; it is not believable that a doctor would or would not recommend it to a patient based on the doctor's relationship with Golla. Even if that were to happen, Novo cannot demonstrate that monetary damages would be insufficient. Regardless, Golla is not going to sell BioMarin's gene therapy until

after the FDA approves it (if at all), at the earliest in the third fiscal quarter. Thus, even if there were actually potential harm, it is certainly not imminent.

Novo's reliance on a non-existent "settlement agreement" is even more far-fetched. There was no settlement agreement, there was no discussion of settlement, and what Novo describes does not even constitute a legal contract.

Finally, although Novo dramatically characterizes (Mot. at 2) the loss of three employees as a "raid," the fact is that it made no attempt to enforce its claimed non-compete against one of those employees, and its own managers advised against pursuing enforcement against another.

Having failed to meet its heavy burden of establishing each element for a TRO, Novo's Motion should be denied.

## II.    NOVO HAS NOT MET ITS BURDEN FOR INJUNCTIVE RELIEF

To obtain a temporary restraining order or preliminary injunctive relief, Novo must show: (1) substantial likelihood that it will prevail on the merits, (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted, (3) its threatened injury outweighs the threatened harm to Golla, and (4) granting the TRO will not disserve the public interest. *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 768 (5th Cir. 2007) (internal quotation omitted). If Novo fails to meet *any* of the four requirements, the Court cannot grant injunctive relief. *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003).

Because injunctive relief is considered an "extraordinary and drastic remedy," it is not granted routinely, "but only when the movant, by a clear showing, carries the burden of persuasion." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). Even when a movant establishes each of the four requirements, the decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). Granting such relief remains the exception rather than the rule. (*Id.* at 621).

Moreover, Novo has not met its burden because it states the agreement attached as Exhibit B to Keith Middleston's Declaration was provided to Golla at the outset of her employment. (Dkt. No. 10-2). That agreement does not contain a post-employment non-compete. For that reason alone, Novo's motion should be denied. If the Court finds that Golla is bound by the Non-Compete cited in Novo's motion, Novo still falls far short of the showing needed to obtain injunctive relief.

A.    **Novo Has Not Demonstrated A Substantial Likelihood That It Will Prevail On Its Claim That Golla Breached the Non-Compete.**

1.    *Texas Law Applies to Enforcement of the Non-Compete.*

Although the Agreement purports to require the application of New Jersey law, Texas law applies to the threshold question of whether it should be enforced in this case. District courts sitting in diversity apply the choice-of-law rules of the forum state. *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004).

Pursuant to Texas's choice-of-law rules, the Court should apply Texas law because (1) Texas has a more significant relationship with the parties; (2) Texas has a materially greater interest in the determination of the issue than New Jersey; and (3) the choice-of-law provision in the Agreement violates a fundamental public policy of Texas. *See Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 325 (Tex. 2014); *see also DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990).

Novo hired Golla to work from her home office in Texas. (Golla Decl. ¶ 6).[2] She interviewed with Novo from Houston via Skype with a Novo manager who was in Alabama. (*Id.* ¶ 6). Golla signed the Agreement with Novo in Houston, and Golla's work was primarily to be performed in Texas, along with the surrounding states of Louisiana, New Mexico, and Oklahoma. (*Id.* ¶ 6). Golla is a resident of Texas and sold to customers in Texas during her employment. (*Id.* ¶¶ 2,8). The only link to New Jersey is that it is Novo's principal place of business. Thus, Texas has a more significant relationship with the parties and the Agreement than New Jersey. *See DeSantis*, 793 S.W.2d at 678-79 (Texas had a more significant relationship with parties to a non-compete than Florida because the place of performance was Texas, the employee's new position was in Texas, and the agreement was executed in Texas, even though some negotiations were in Florida and the former employer's headquarters were in Florida).

---

[2] Julie Golla's Declaration ("Golla Decl."), attached as Exhibit A.

Texas also has a materially greater interest than New Jersey in determining whether the Non-Compete is enforceable. At issue is whether a national employer doing business in Texas (Novo) can prohibit its former Texas-based employee (Golla) from working at another Texas-based position at another national employer doing business in Texas (BioMarin). On the other hand, New Jersey's "direct interest in the enforcement of the noncompetition agreement in this case is limited to protecting a national business headquartered in that state." *DeSantis*, 793 S.W.2d at 679. These circumstances "leave little doubt, if any, that Texas has a materially greater interest than" New Jersey. (*Id.*).

Finally, applying New Jersey law would be contrary to a fundamental policy of Texas. The Texas Supreme Court has found that "the law governing enforcement of noncompetition agreements is fundamental policy in Texas, and that to apply the law of another state to determine the enforceability of such an agreement in the circumstances of a case like this would be contrary to that policy." *DeSantis*, 793 S.W.2d at 681; *ADP, LLC v. Capote*, No. A-15-CA-714-SS, 2016 WL 3742319, at *6-7 (W.D. Tex. July 7, 2016) (notwithstanding agreement's New Jersey choice-of-law, Texas law applies to claims regarding covenants not to compete because "the law governing same is a fundamental policy in Texas and application of New Jersey law would be contrary to that

policy") (internal quotation omitted). Therefore, all three factors favor the application of Texas law.

2.    ***BioMarin is Not a Competitor of Novo.***

Novo cannot show a substantial likelihood that Golla has breached – or will ever breach – the Agreement because it does not bar Golla's employment with a company that does not compete with Novo.[3] The Agreement provides that Golla will not "individually compete, or be employed by, work for, advise, provide services to, or assist in any way *any competitor* of the Company by performing work involving or related to the disease state in which [she] worked or was involved" (emphasis added). It also states that Golla may not "individually compete, or be employed by, work for, advise, provide services to, or assist in any way *any competitor* of the Company by working on, or having any involvement or communication with respect to, products that compete with or are the same as products that [she] worked on, was involved with, or about which [she] had access to any information, during the last twelve months of [her] employment with the Company." (emphasis added). (*See also* Mot. at 3 (Novo describing the Non-Compete as prohibiting Golla from "performing work for a competitor (a) in the

---

[3] Had Novo intended the Non-Compete to apply more broadly, it would have drafted it that way. In fact, Novo did draft a broader restriction applicable during Golla's employment. (*See* Dkt. No. 10-2 Agreement ¶ 6 ("During the term of my employment, I shall not [provide services to] or otherwise be connected with any entity which is engaged in a business similar to, or competitive with, the Company.").)

disease state . . ., or (b) relating to products . . .").)  Thus, the noncompetition restrictions in the Agreement apply only to a competitor of Novo.

But BioMarin is not a "competitor"[4] of Novo.  None of the six BioMarin products that are currently approved for use in the United States treat a disease for which Novo owns or markets a product.  (Cones Decl. ¶ 12).[5]  BioMarin does not market or sell any factor VIII replacement therapies, and therefore does not today (and will not) compete with Novo Nordisk in the factor replacement market.  (*Id.*). BioMarin's only hemophilia product, Valoctocogene roxaparvovec, is a novel gene therapy that has not yet been approved by the FDA; the FDA will likely not decide whether to grant BioMarin's application for approval until late in the third quarter of 2020.  (*Id.* ¶ 22). Until the FDA approves BioMarin's gene therapy, BioMarin (and therefore Golla) cannot actively market or sell it.  (*Id.* ¶ 20).  BioMarin does not expect to recognize revenue for gene therapy to treat hemophilia A for many weeks or months after the FDA approves its application.  (*Id.*).  Therefore, the work that Golla will be doing for BioMarin until at least the third quarter of 2020 will not constitute competition against Novo, and cannot be enjoined.

Factor VIII drugs and gene therapy are different.  Novo's hemophilia drugs treat the condition with regular infusions of pharmaceutical components that

---

[4] To the extent the Court finds the term "competitor" ambiguous, any ambiguity should be construed against Novo.
[5] John Cones' Declaration, attached as Exhibit B.

replace, in the case of Hemophilia A, clotting factor VIII. (*Id.* ¶¶ 8,11). At Novo, that drug is NovoEight,[6] which is, in short, a short-term pharmaceutical treatment. (*Id.* ¶ 8).

There are approximately 20 different factor VIII replacement therapies on the market. (*Id.* ¶ 10). While there are some differences among the factor VIII replacement products (plasma derived vs. recombinant, standard half-life vs. extended half-life), they are substantially similar and are often prescribed based on the doctor's and patient's preferences. (*Id.*).

Gene therapy is a form of treatment designed to address the genetic problem by transferring a functional gene that allows the patient's body to produce its own Factor VIII. (*Id.* ¶ 14). In gene therapy research, a functional gene is inserted into a viral vector. (*Id.*). The viral vector acts as a delivery vehicle, providing the ability to deliver the functional gene to targeted cells. (*Id.*). The cells can then use the gene sequence inside the viral vector to build the functional proteins that the body needs to produce Factor VIII. (*Id.*).

The FDA has not yet approved any gene therapies for hemophilia or determined that any gene therapies for hemophilia are safe or effective. (*Id.* ¶ 15). If approved by the FDA, BioMarin's gene therapy will provide qualifying

---

[6] Although Novo claims in its Motion (Mot. at 6) to have two drugs on the market, its second drug, Esperoct, has not yet launched. https://endpts.com/ip-trouble-defers-launch-of-novos-long-acting-hemophilia-therapy/.

hemophilia A patients with a treatment option that could eliminate the need for regular factor VIII infusions. (*Id.* ¶ 17).

In clinical trials, BioMarin's gene therapy treatment consisted of a single intravenous infusion into the patient's body of a genetically engineered vehicle known as a viral vector that carries a gene sequence that may allow the patient's body to produce its own factor VIII. (*Id.* ¶ 18). With the new functioning Factor VIII gene, Valoctocogene roxaparvovec is designed to allow the patient's own liver cells to begin producing the factor VIII protein. (*Id.*). Thus, Valoctocogene roxaparvovec is not a factor VIII replacement drug; instead it is designed to transfer a functioning gene to the patient's liver cells, allowing the patient's liver to produce endogenous Factor VIII, rather than having to infuse exogenous factor replacement therapy to treat their hemophilia A. (*Id.*).

In contrast with factor VIII replacement drugs, which require intravenous injections multiple times per week, the Valoctocogene roxaparvovec clinical trial data has shown patients' factor VIII levels can remain at a therapeutic level for up to three years after administration, if not significantly longer. (*Id.* ¶ 19).

BioMarin estimates, based on the clinical trial protocol submitted to the FDA, that only about 10% of the hemophilia A population will be eligible for its gene therapy treatment. (*Id.* ¶ 21). For example, the clinical data submitted to the FDA involved only adults and patients with severe hemophilia A. (*Id.*). Other

hemophilia A patients may not qualify for Valoctocogene roxaparvovec if they have other comorbidities (HIV, hepatitis) or they have an antibody response to the type of viral vector being used by BioMarin. (*Id.*).

Golla does not dispute that the Agreement prevents her from selling clotting factor VIII replacements manufactured by other pharmaceutical companies, but that is simply not what BioMarin's gene therapy does.[7]

Moreover, because of FDA regulation, Golla will not promote Valoctocogene roxaparvovec before and unless BioMarin obtains FDA approval. (*Id.* ¶ 20). Her first week of employment at BioMarin is focusing on general on-boarding and training on BioMarin's systems. (*Id.* ¶ 33). She will eventually transition to receive internal training relating to general gene therapy research concepts as well as compliance training on how to respond to specific questions from customers regarding BioMarin's not-yet-approved product to ensure that she does not make any statements about unapproved products. (*Id.*).

After this phase of internal training, Golla's role will focus on general gene therapy research education. (*Id.*). During this phase, she will communicate with healthcare providers, treatment centers, and advocacy groups about how gene therapy research is being conducted and what the research is seeking to understand.

---

[7] Novo's citation (Mot. at 25) to *Elizabeth Grady Face First, Inc. v. Escavich*, 321 F. Supp. 2d 420, 423 (D. Conn. 2004), trivializes the significant differences between gene therapy and its replacement treatments.

(*Id.*).  Golla will neither volunteer nor, if asked, answer any questions about BioMarin hemophilia products before FDA approval.  (*Id.*).  The literature Golla will use and distribute during gene therapy research education will relate to general gene therapy research education, will not focus exclusively on hemophilia, and will be reviewed and approved in advance by BioMarin's internal compliance department.  (*Id.* ¶ 35).  Only if BioMarin's gene therapy treatment is approved by the FDA, will Golla transition into a role promoting this therapy to health care providers, advocacy groups, and hemophilia treatment centers.  (*Id.*).

<strong>3.     <em>Novo's Legitimate Business Interest is Narrower than the Non-Compete.</em></strong>

A covenant not to compete is not enforceable unless it imposes no greater restraint than necessary to protect a legitimate business interest of the employer. Tex. Bus. & Com. Code §§ 15.50(a).  *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681 (Tex. 1990).  Courts consider an employer to have a legitimate business interest in protecting business goodwill, trade secrets, and other confidential or proprietary information.  *DeSantis*, 793 S.W.2d at 681.

The Non-Compete here imposes a greater restraint than necessary to protect Novo's legitimate business interests.  In seeking to enforce the Non-Compete to prohibit Golla from working at BioMarin, Novo (Mot. at 20-21) points to loss of confidential and proprietary information and loss of customer goodwill.  But none justify prohibiting Golla from working at BioMarin.

Novo has no legitimate interest in Golla's pre-existing knowledge and customer relationships. Indeed, "a restraint that prevents [former employee] from continuing long-standing relationships that he brought with him to [former employer] is overbroad." *Staples, Inc. v. Sandler*, No. 3:07-CV-0928-K, 2008 WL 4107656 (N.D. Tex. Aug. 29, 2008), vacated sub nom. *Staples, Inc. v. Alan Sandler Preferred Office Prod., Inc.,* No. C.A. 3:07-CV-0928-K, 2009 WL 1285838 (N.D. Tex. May 7, 2009). In *Staples*, a sales employee worked at Staples for only eleven months, during which time he primarily serviced customers he had from previous employment. (*Id.* at *5.) The court found the non-compete was overbroad and enforceable as written to the extent it prohibited the employee from servicing customers he had before joining the company. (*Id.*). Thus, the court held, Staples' legitimate interest in enforcing the non-competition agreement was much narrower in scope than the activity it sought to restrain. (*Id.*).

Golla's relationships with practitioners and Hemophilia Treatment Centers were similarly cultivated before her employment at Novo. (Golla Decl. ¶¶ 3, 4). In fact, Golla was an attractive candidate to Novo because of her existing knowledge of hemophilia and her relationships in the hemophilia community. (*Id* ¶ 7). Novo's claim that "Golla had little meaningful experience in the hemophilia disease state prior to joining Novo" and that "Golla spent only two years working in the hemophilia disease state" (Mot. at 8) and is belied by the resume Novo

attached to its motion. Golla began working in the hemophilia disease state in 2012 (Golla Decl. ¶ 3) and developed a deep knowledge of hemophilia and its patient base through her previous employment. (*Id.* ¶¶ 3, 4). In fact, during her employment at Novo, Golla did not obtain any new customers or contacts in the territory in which she work for BioMarin (*i.e.*, the southern half of Texas). (*Id.* ¶ 16). She did, however, leverage her preexisting relationships and knowledge to produce favorable outcomes for Novo. (*Id.* ¶¶ 17, 18).

Novo also mischaracterizes Golla's training at Novo. Golla worked at Novo for just over thirteen months. (*Id.* ¶ 5). Golla did not obtain her knowledge regarding hemophilia and factor replacement therapies from Novo; she received that training and knowledge from two previous employers. (*Id.* ¶¶ 3-4, 9). When she started at Novo, Golla underwent four disease state training modules: one on hemophilia A, one on hemophilia B, and two on other bleeding disorders. (*Id.* ¶ 9). The hemophilia A product module consisted of general scientific information she already knew from the training she received at two previous employers. (*Id.*). She also took eight Novo product modules, which were specific to Novo products. (*Id.*). Golla did not complete training modules that Novo offered in late 2019. (*Id.* ¶ 10).

Novo also fails to explain what confidential information is at risk, instead referring generally to "business strategies" and "information relating to"

hemophilia health care providers. (Mot. at 7). Because BioMarin's product, if it is approved, is vastly different from NovoEight, BioMarin would not benefit from having access to any Novo information, even if Golla had such information. Moreover, knowledge or information about Novo's customer base is public knowledge. (Golla Decl. ¶ 11). A simple Google search would reveal the various hospitals, hemophilia treatment centers, or specialty pharmacies to which Golla sold or marketed Novo's products. (*Id*. ¶ 11). Golla will not be involved with crafting any marketing strategy at BioMarin, and a general marketing strategy for gene therapy has already been developed. (Cones Decl. ¶ 37). Novo's reference to "key opinion leaders" is misplaced, as the identities of these individuals are common knowledge in the industry and Golla knew the key opinion leaders in her territory before coming to Novo. (Golla Decl. ¶ 12). Besides, the non-disclosure provision in the Agreement (Dkt. No. 10-2, Agreement § 2) adequately protects Novo's trade secrets and confidential information. And, as a condition of her employment at BioMarin, Golla signed a comprehensive checklist that she would not use or disclose any of Novo's confidential information in connection with her employment at BioMarin. (Golla Decl. ¶ 30; Cones Decl. ¶ 30). Golla has made clear that she intends to honor her confidentiality obligations to Novo (Golla Decl. ¶ 25), and Novo has presented no evidence to the contrary.

Because Novo lacks a legitimate business interest in enforcing the Agreement to prohibit Golla from working at BioMarin, it is unlikely to succeed on the merits.

### B. Novo Has Not Shown There Is a Substantial Threat of Irreparable Injury If Golla Is Not Enjoined.

Novo's Motion should be denied because it cannot meet its burden of demonstrating that there is a substantial threat that it will suffer irreparable injury if the injunction is not granted. To demonstrate a substantial threat of an irreparable injury, Novo must show a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm. *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). Demonstrating irreparable harm is a heavy burden and "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *TRAVELHOST, Inc. v. Figg*, No. 3:11-CV-0455-D, 2011 WL 6009096, at *4 (N.D. Tex. Nov. 22, 2011) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)); *see also Brink's Inc. v. Patrick*, No. 3:14-CV-775-B, 2014 WL 2931824, at *7 (N.D. Tex. June 27, 2014) (finding that employers cannot show irreparable harm merely by claiming breach of a non-compete agreement; rather, employers must "submit evidence and carry [their] burden to demonstrate that there is a substantial threat that [they] will experience irreparable harm.").

Any injury claimed by Novo cannot plausibly be characterized as "a significant threat" or "imminent" (let alone both) given the nature of Golla's role at BioMarin, her job responsibilities, and the uncertainty associated with FDA approval of BioMarin's gene therapy. As described above (p. 11), Golla's employment at BioMarin will begin with *internal* training relating to gene therapy research concepts, as well as compliance training regarding how to respond to specific questions from customers regarding BioMarin's not-yet-approved product to ensure that she does not make any statements about unapproved products. (Cones Decl. ¶ 33).

Golla cannot, and will not, engage in any specific discussion about BioMarin's gene therapy unless that therapy is approved by the FDA, late in the third quarter of 2020, and possibly later. Golla will not disparage Novo's products,[8] and until FDA approval she will not promote BioMarin's work in gene therapy for hemophilia.

If – and only if – the FDA approves BioMarin's gene therapy treatment, will Golla then transition into a role promoting this therapy to prescribers and hemophilia treatment centers in the southern half of Texas. (*Id.* ¶¶ 20, 31). Approval, if it occurs at all, may occur after expiration of the Non-Compete. This is not "imminent" by any measure. Thus, Novo cannot carry its burden of showing

---

[8] The FDA prohibits comparisons between two treatments absent direct clinical support. 21 C.F.R. 202.1(e)(6)(ii).

that it would be imminently harmed by Golla engaging in weeks of internal training, followed by months of educating the community regarding a new scientific technique that Novo does not use.

Nor can Novo argue that it will be harmed because of *Golla's* work at BioMarin (rather than its gene therapy treatment generally). As explained, factor VIII treatments and gene therapy are very different, and BioMarin estimates that only about 10% of the hemophilia A population will be eligible for its gene therapy treatment. (Cones Decl. ¶ 21). A physician treating hemophilia is unlikely to recommend gene therapy instead of a more traditional replacement treatment like NovoEight based on their relationship with or recommendation from *any* BioMarin representative. If a physician recommends that a patient be evaluated for eligibility for gene therapy, it will be due to his or her medical judgment and the needs of the patient. *See M-I, L.L.C. v. Stelly*, No. H-09-CV-01552, 2009 WL 2355498, at *6 (S.D. Tex. July 30, 2009) (finding no irreparable harm where the employer could not identify any specific job it had lost *because of the employee's departure*).)

Thus, Novo cannot identify a significant threat that it will suffer because of Golla's employment at BioMarin or that any such harm is imminent. Novo cannot identify any injury based on more than its own unfounded fear that cannot be cured by money damages, either. Novo has not met its burden and its Motion should be denied. *See*, *e.g.*, *W.R. Grace & Co.-Conn. v. Henson*, No. 13-06-668-CV, 2007

WL 2389547, at *4 (finding no irreparable harm where the employer did not claim it had lost any business, did not prove that the former employee used any confidential information to solicit business for his new employer, and provided no evidence regarding harm or injuries that could not be remedied by monetary damages or that were not readily calculable); *Tom James Co. v. Mendrop*, 819 S.W.2d 251, 253 (Tex. App. - Fort Worth 1991, no writ) (finding no irreparable harm where employer failed show any loss of clients, goodwill, sales, and potential sales since employee brought with him to the former employer a list of between 200-500 prospective clients, the sales methods former employer taught employee were similar to those he had learned in his prior sales positions, and employee rejected some of the techniques in favor of his own).

 C. **The Balance of Harms Favors Golla.**

 Novo must also show that its threatened injury outweighs the threatened harm to Golla. *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d at 768. Novo cannot meet this burden.

 Novo has not set forth any evidence that it will be harmed. Golla diligently returned all her company materials and Novo has only made vague statements about the information it claims is at risk. Golla's relationships with the hemophilia community are preexisting, and in any case will be of diminished importance given the nature of her new role at BioMarin.

Golla faces substantial harm if injunctive relief is granted. Golla found the position at BioMarin attractive because it involved less travel, which permits her to care for her husband, who has cancer that has progressed over the last year. (Golla Decl. ¶ 22). The Non-Compete does not provide for payment of benefits, such as health insurance, which would impose a significant financial burden on Golla given her husband's illness. (*Id*. ¶ 33). Payment of Golla's base salary does not make her whole. Golla's compensation at BioMarin would be significantly larger than her base salary at Novo. (*Id*. ¶ 37). Moreover, Golla's incentive compensation was a significant portion of her income at Novo, and without it, her family would face a significant financial hardship. (*Id*. ¶ 34). Golla would also be prevented from using her hemophilia expertise. In fact, this experience is likely what made her an attractive candidate for the position at Novo. (*Id*. ¶ 7). If forced to seek other employment, Golla would likely have to find a lower-level position in a different field that requires significant travel. (*Id*. ¶ 35). Therefore, the balancing of harms weighs in Golla's favor.

### D. Granting Injunctive Relief Will Disserve the Public Interest

Granting injunctive relief here will disserve the public interest. As outlined above, Golla's role after training and before FDA approval will be educating the community about how gene therapy research is being conducted. The public has an interest in doctors and treatment centers having as much information as possible

regarding potentially groundbreaking treatments for disease. Given that gene therapy has only been approved to treat two disorders to date (Cones Decl. ¶ 15), ensuring that medical professionals understand how gene therapy works is important. An injunction would curtail physician and provider education, and in turn, harm patients.

### E. Novo's Other Claims Do Not Merit Injunctive Relief

Novo is not entitled to injunctive relief on its other claims. Novo's claim that Golla breached a non-existing settlement agreement should be rejected outright. There was no settlement agreement. Counsel for Golla Matthew Ray and counsel for Novo never even discussed settlement. (Ray Decl. ¶ 8).[9] Novo informed Golla that it would pay her salary (as required by the Agreement) and asked if she will still go to Biomarin. (*Id.* ¶ 4). In response, Ray informed Novo's counsel that Golla had decided not to go to BioMarin. (*Id.* ¶ 5). Because there was no longer an active dispute, Ray told counsel he would dismiss the Complaint for Declaratory Judgment. (*Id.* ¶ 6). Novo does not identify any terms of the purported settlement agreement; instead, it points to its existing obligation under the Agreement. That is not a legally binding agreement. "A promise to fulfill a pre-existing obligation cannot serve as new consideration." *S.M. Wilson & Co. v. Urban Concrete Contractors*, No. 04-06-00227-CV, 2007 WL 1423881, at *4

---

[9] Mathew W Ray's Declaration ("Ray Decl."), attached as Exhibit C.

(Tex. App. May 16, 2007) (quoting *Walden v. Affiliated Computer Servs., Inc.*, 97 S.W.3d 303, 319 (Tex. App. 2003)) (internal quotation marks omitted) (finding that a party's promise to do what it was already bound to do under the terms of the parties' original subcontract agreement was not valid consideration for an alleged oral agreement).

Novo's attempt to charge BioMarin with tortious interference of the non-existent settlement agreement also fails. Even if there were an agreement (there was not), Novo has zero evidence that BioMarin interfered with it in any way. In fact, *no one* at BioMarin attempted to get Golla to change her mind after she informed BioMarin of her initial decision. (Golla Decl. ¶ 29). Novo reached the opposite conclusion because "there is little else to explain" it. (Mot. at 31.) That is not sufficient evidence to support injunctive relief. Golla changed her mind after she had sufficient time to think about it and discuss it with her family over a weekend (Golla Decl. ¶ 28); Novo had given her a deadline of only 24 hours (*Id*. ¶ 26).

Novo's other tortious interference claim also fails. As explained above, Golla is not violating the Non-Compete. To the extent the Non-Compete purports to prohibit Golla from working in her position at BioMarin, it is overbroad and unenforceable and cannot form the basis of a tortious interference claim. *See Travel Masters, Inc. v. Star Tours, Inc.*, 827 S.W.2d 830 (Tex. 1991) (non-

compete that is an unreasonable restraint of trade or unenforceable on grounds of public policy cannot form the basis of an action for tortious interference).

III.    **CONCLUSION**

For the foregoing reasons, Golla and BioMarin respectfully request that this Court deny the Motion for a Temporary Restraining Order and a Preliminary Injunction.

Dated:  January 22, 2020                    Respectfully submitted,

                                            */s/ Joanne R. Bush*
                                            Joanne R. Bush
                                            Texas Bar No. 24064983
                                            Southern District of Texas No. 2175417
                                            jrbush@jonesday.com
                                            Jones Day
                                            717 Texas, Suite 3300
                                            Houston, Texas 77002
                                            Telephone: (832) 239-3782
                                            Facsimile: (832) 239-3600

                                            *Attorney for Plaintiff/Counterclaim
                                            Defendant Julie Golla*

                                            *Attorney for Third-Party Defendant
                                            BioMarin Pharmaceutical Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 22, 2020, I electronically filed a true and correct copy of the foregoing with the Clerk of the District Court of the Southern District of Texas using the CM/ECF system, which will send notification to all counsel of record who are registered CM/ECF users.

*/s/ Joanne R. Bush*
Joanne R. Bush
